FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
AUG 13 2018
BROOKLYN OFFICE

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

CAITHNESS LONG ISLAND II, LLC,
CAITHNESS ENERGY, LLC

             Plaintiffs,

     v.

PUBLIC SERVICE ENTERPRISE GROUP
INCORPORATED, PSEG LONG ISLAND
LLC,

             Defendants.

**CV 18 - 4555**

Case No. _____

**SEYBERT, J.**
**SHIELDS, M.J.**

## COMPLAINT

Plaintiffs Caithness Energy, LLC ("Caithness") and Caithness Long Island II, LLC ("Caithness II"), by their undersigned attorneys, bring this action against the above-named Defendants, demanding a trial by jury. As and for their Complaint against Defendants, Caithness and Caithness II allege upon personal knowledge for their own acts and as to events taking place in the presence of their officers, directors, agents, and representatives, and upon information and belief for all other facts, the following:

### NATURE OF THE ACTION

1.    This action arises out of Defendants PSEG and PSEG LI's thus far successful efforts to exclude competition from a new, state-of-the-art power plant in Suffolk County that would decrease Long Island's reliance on expensive imports of electricity produced by PSEG and that would promote economic development on Long Island, create many local jobs, modernize and enhance the electric system, and protect the environment.

2.    Plaintiffs Caithness and its subsidiary, Caithness II, are the developers of this proposed 750 megawatt (MW) plant (sometimes referred to herein as the "Plant"). A Caithness

affiliate already owns and operates a plant in the Town of Brookhaven at the same site where the new plant would be situated. Since beginning commercial operations in 2009, this existing plant—the most efficient on Long Island—has been enormously successful.

3.     In 2013, after a multi-year competitive bidding process that was launched with a 2010 Request for Proposals ("RFP"), the Long Island Power Authority (the "Authority" and, together with its subsidiary, Long Island Lighting Company ("LILCO"), "LIPA") selected Caithness II to develop the Plant—a decision the New York Power Authority validated as prudent. The new Caithness II Plant was projected to come on line in 2018. Among other benefits, the Plant would allow LIPA to retire old and inefficient plants in other parts of Long Island. An outside consulting firm concluded in September 2013 that the cost savings from retiring these plants could be as high as $1 billion.

4.     While Long Island stood to benefit from the Caithness II plant, PSEG's profits were at substantial risk. Much of the power generation capacity on Long Island comes from old, dirty, and highly inefficient power plants from the 1950s, 1960s, and 1970s. As a result, Long Island imports approximately 45 percent of its electricity, including from plants owned by PSEG in New Jersey, Connecticut, and upstate New York. If Caithness II moved forward, the need to import power from these PSEG plants would decrease significantly. Moreover, the availability of roughly 750 MW of additional, efficient capacity from the new Plant would also lead to lower regional power prices overall—not only on Long Island but also in areas from which power is currently imported to Long Island—decreasing PSEG's profits even on sales to other customers. PSEG well understood this risk and expressly warned investors that "Newer generation facilities", *i.e.*, plants like the Caithness II Plant, "are often more efficient than aging facilities, which may put some of these older [PSEG] facilities at a competitive disadvantage."

2

5.     By the summer of 2014, plans for the Plant were well on their way.  LIPA had already authorized permitting activities for a critical natural gas pipeline associated with the project.  And the terms of a long-term power purchase agreement between the Authority and Caithness II were also nearing completion, a key milestone in allowing Caithness and Caithness II to move forward with the financing and development of the Plant.

6.     Then, in August 2014, PSEG, through and together with its subsidiary PSEG LI, commenced a multi-year scheme to interfere with Plaintiffs' prospective business and contemplated agreements with the Authority and prevent the construction of the Plant thereby excluding the additional, highly competitive energy output the Plant would have provided Long Island.

7.     PSEG LI had been selected in 2011 to operate and maintain LIPA's transmission and distribution system as a service contractor.  A 2013 statute granted Defendants additional operational and policy making authority, which further increased Defendants' leverage over LIPA.

8.     PSEG LI's expanded role included long-term power supply strategy and planning, effective January 1, 2015.  In August 2014, Defendants began to interfere with Plaintiffs' contemplated agreements with the Authority, and to exclude Plaintiffs as a competitor, by issuing a summary report critical of LIPA's prior resource planning and by recommending that LIPA delay commitments on all then-current proposals for new power generation, including the Caithness II Plant.

9.     In short, just one year after a comprehensive LIPA review—supported by outside experts and the New York Power Authority—that had concluded that the size, flexibility, and optionality of the Caithness II Plant would let LIPA meet the demands of its customers,

3

Defendants intervened aggressively to derail the project by undertaking studies and making recommendations.

10.     PSEG LI's claim that the Caithness II Plant would not benefit Long Island is pretextual. The development of the Plant would allow for the seamless retirement of obsolete plants within LIPA's current resource base. PSEG LI's analysis assumes LIPA will continue to rely on these plants—despite the fact that they are more than forty years old and despite their unreliability, high operating costs, and negative environmental impacts. This assumption furthers PSEG's economic interests at the expense of economic, environmental, and other interests of Long Island itself. In the absence of more efficient on-Island alternatives, LIPA will need to continue to import power from off-Island plants, including PSEG's own plants with PSEG reaping the profits. Caithness II is a threat to these profits because it is an efficient, state-of-the-art design that can generate power more cheaply than PSEG's facilities, whose sales to LIPA would be displaced.

11.     In analyzing the merits of the Plant for LIPA, PSEG LI has misrepresented and hidden key facts, including regarding the clear conflict of interest that taints its analysis and conclusions regarding the Caithness II project. None of PSEG LI's analyses of the benefits of the Plant have revealed the economic harm PSEG LI's affiliates would suffer if the project proceeded. To the contrary, PSEG has publicly suggested that it is indifferent to whether the Caithness II Plant comes online because "PSEG has no direct contracts to sell power to LIPA" and has no "ability to profit from" LIPA power purchases across power cables from Connecticut and New Jersey, where PSEG owns and is developing plants. In fact, however, LIPA routinely imports substantial amounts of electricity to Long Island through the operation of the regional electricity markets, i.e., without direct contracts. Had PSEG not wrongfully interfered with the

4

development of the Caithness II project, those imports would have declined—resulting in tens of millions of dollars of lost revenue to PSEG.  For this reason, PSEG exploited PSEG LI's position with LIPA to interfere with the Caithness II project, notwithstanding its false protests of neutrality.

12.    PSEG LI has also misrepresented the costs associated with the Caithness II project in an effort to falsely portray the project as uneconomic and detrimental to ratepayers.  In 2015, PSEG LI took the position that Caithness II was required to comply with binding interconnection requirements that would have cost many hundreds of millions of dollars. PSEG LI's cost estimate was false because it purported to impose obligations on Caithness II that were inconsistent with the governing interconnection standards and tariffs.  In subsequent litigation, the Federal Energy Regulatory Commission ("FERC") confirmed that PSEG LI had no basis to impose these costly interconnection obligations on the Caithness II project, meaning the relevant electrical interconnection costs are actually less than $50 million.

13.    PSEG LI knowingly employed dramatically overstated cost assumptions in the analysis of the cost effectiveness of the Plant to support its recommendation that the Plant is not needed.  Even after the FERC decision, PSEG LI, in combination with LIPA, continued wrongfully to claim the hundreds of millions of dollars of interconnection reinforcements were Caithness II's burden to absorb as a precondition of entering into a power purchase agreement with LIPA.  These costs, as PSEG LI knew at the time, were plainly not a function of the Caithness II project, as shown by the fact that LIPA is proceeding with substantial portions of these interconnection upgrades even though Defendants have prevented the Plant from proceeding.

5

14.     Defendants used their influence over LIPA, and their false and misleading statements to LIPA, to induce LIPA to agree with, and participate in, PSEG LI's anti-competitive efforts to derail the Caithness II Plant, and to agree to cancel the 2010 RFP, including the development of the Caithness II project.

15.     PSEG LI's combination with LIPA to delay and derail the Caithness II project is an agreement, combination, and/or conspiracy in restraint of trade in violation of Section 1 of the Sherman Act.  PSEG and PSEG-LI have also tortiously interfered with Caithness II's prospective business relations with LIPA by using dishonest, unfair, and improper means, including by wrongfully claiming the Caithness II Plant would require hundreds of millions of dollars in upgrades to the Long Island transmission and distribution system and by deliberately hiding the true nature of PSEG's conflict of interest and the loss of tens of millions of dollars of revenue at stake for PSEG if the Caithness II project were to proceed.

16.     Caithness and Caithness II have suffered hundreds of millions of dollars of harm as a direct and proximate cause of PSEG and PSEG LI's wrongful conduct.  Caithness and Caithness II bring this action to recover for this harm and for treble and punitive damages.

## THE PARTIES

17.     Plaintiff Caithness, a Delaware limited liability company, is an independent power producer specializing in the development, acquisition, operation, and management of environmentally progressive power generation assets in North America.  Its principal place of business is New York, NY.

18.     Plaintiff Caithness II is a wholly owned subsidiary of Caithness, which was formed to develop and operate a power generation project selected by LIPA in response to an

August 2010 RFP.  Caithness II is a Delaware limited liability company with its principal place of business in New York, New York.

19.    Defendant Public Service Enterprise Group Incorporated ("PSEG") is a New Jersey corporation with its principal place of business in Newark, New Jersey.  Its subsidiary, PSE&G, is one of the largest public utilities in the United States and provides electric and gas transmission and distribution ("T&D")[1] to residential, commercial, and industrial customers in a service territory that covers roughly 70% of New Jersey's population.  Through its subsidiary, PSEG Power LLC, PSEG also markets power produced by its many power plants in the northeastern United States and transacts in natural gas and other energy-related products on the spot market and through short- and long-term contracts for physical and financial products.

20.    Defendant PSEG Long Island LLC ("PSEG LI") operates LIPA's electric T&D system under a contractual agreement with LILCO.  PSEG LI is a wholly owned subsidiary of PSEG.

## JURISDICTION, STANDING, AND VENUE

21.    Plaintiffs bring this action to recover damages, including treble damages, cost of suit, reasonable attorney's fees, and injunctive relief arising from Defendants' violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.  Plaintiffs also bring against Defendants a claim pursuant to the Donnelly Act, N.Y. General Business Law § 340, and a claim for tortious interference under New York law.

---

[1] "Transmission" refers to the movement of electricity at high voltage from generating plants to substations and transformers, where it is then reduced to a lower voltage for distribution to homes, business, and industrial customers. "Distribution" refers to the delivery of electricity and gas to the retail customer's home, business, or industrial facility.

22.     This Court has subject matter jurisdiction of the Plaintiffs' federal law claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1337. This Court has jurisdiction of the Plaintiffs' state law claim pursuant to 28 U.S.C. § 1367(a).

23.     Plaintiffs have standing to bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.

24.     As described in this complaint, Defendants have committed antitrust violations that have harmed Caithness and Caithness II by foreclosing Caithness II's ability to supply electricity to LIPA. In addition, Defendants' actions have had and are continuing to have a substantial adverse effect on competition in the market to supply electricity to Long Island and thereby have harmed consumers.

25.     This Court has personal jurisdiction over Defendants and venue is proper in the Eastern District of New York pursuant to Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 28 U.S.C. § 1391, because Defendants transact business in New York and, specifically, on Long Island, and Defendants are subject to personal jurisdiction in this district.

## FACTS

### I.     THE LONG ISLAND POWER AUTHORITY AND PSEG LI

26.     The Authority was established in 1986 by the Long Island Power Authority Act. Its stated mission is to provide an adequate supply of electricity in a reliable, efficient, and economic manner to Long Island customers. In 1998, with the authorization of the New York legislature, the Authority acquired the electric T&D system, an interest in an upstate nuclear power plant, and certain power supply and transmission contracts from LILCO, a New York corporation now wholly owned by the Authority. This takeover was anomalous because, historically, New York's electrical needs have been met by the private sector through a market-

8

driven, proprietary model of services.  Today, the Authority provides, through the T&D system of its subsidiary, LILCO, electric service to 1.1 million customers in Nassau County, Suffolk County, and the Rockaways.  LIPA's revenues in 2017 were $3.48 billion.

27.     The Authority itself is governed by a nine-person Board of Trustees ("Board"), with five members appointed by the Governor of New York, two by the Majority Leader of the New York State Senate, and two by the Speaker of the New York State Assembly.

28.     The management and operations of LILCO's T&D system are performed by a contractual service provider.  LIPA has minimal direct involvement in day-to-day utility operations, customer service and support, maintenance, and construction work.  Instead, LIPA operates as a holding company: it manages its finances and contractors, but it does not operate the systems responsible for powering homes and businesses.

29.     For many years, the service provider operating LILCO's T&D operations was National Grid LLC ("National Grid").  In December 2011, LILCO entered into a ten year, $3.9 billion contract with Defendant PSEG LI, a subsidiary of Defendant PSEG that was created specifically to assume responsibility from National Grid for the operations and maintenance of LILCO's T&D system beginning January 1, 2014.

30.     PSEG LI's parent, PSEG, is a holding company with two primary operating subsidiaries: PSE&G and PSEG Power.  PSE&G is a franchised public utility in New Jersey that provides T&D services in a service territory covering 70% of the state.  PSEG Power is a power generating and marketing business that, in addition to producing and selling power, transacts in energy-related products on the spot market or using short-term or long-term contracts for physical and financial products.[2]

_____

[2] "Spot" energy markets trade energy that is available on demand or in the short term.

9

31.     On June 21, 2013, the New York State legislature passed the LIPA Reform Act (the "Reform Act"), which granted LIPA's service provider (since 2014 PSEG LI) with an increased role.  PSEG LI's expanded role gave it significant operational flexibility to manage capital expenditures, budgets, and emergency response preparedness, and, by extension, significant leverage over LIPA.

32.     The Reform Act also required LIPA to reduce significantly its staffing.  Today, LIPA employs only 49 people.  PSEG LI employs 2,350 employees overall and 20 employees at the director level and above.

33.     From the start of its relationship with LIPA, PSEG LI has been controlled by executives with longstanding affiliations with PSEG itself:

      a.     David Daly, PSEG's LI original president and COO, was a 27-year PSE&G veteran before joining PSEG LI, and has now returned to PSE&G as President and Chief Operating Officer;

      b.     Daniel Eichhorn, original vice president of customer services, was with PSE&G for 25 years before joining PSEG LI; and

      c.     John O'Connell, original vice president of transmission and distribution, worked with PSE&G for 27 years before joining PSEG LI.

34.     Today, the majority of PSEG LI's executive leadership continue to have deep ties with PSE&G or PSEG:

      a.     Daniel Eichhorn is now President and COO;

      b.     David Lyons, Vice President of Business Services, joined PSEG in 1981;

      c.     Vaughn McKoy, until recently Vice President of Legal, worked at both PSE&G and PSEG;

    d.      Paul Napoli, Vice President of Power Markets, joined PSE&G in 1979; and

    e.      John O'Connell still serves as Vice President of Transmission and Distribution.

35.    PSEG LI's Board of Directors also has close connections to PSEG itself.  For example, the current chair of the Board, David M. Daly, is the President and Chief Operating Officer of PSE&G.  The former chair of PSEG LI's Board of Directors was Ralph LaRossa, who is the President and Chief Operating Officer of PSEG Power.

**II.    LONG ISLAND'S POWER REQUIREMENTS**

36.    Long Island is a narrow, approximately 120-mile long island with a maximum north-to-south distance of 23 miles stretching east-northeast from New York Harbor into the Atlantic Ocean.  The Long Island transmission system has only limited ties to the New York State Transmission System operated by the New York Independent System Operator ("NYISO") to its west and north.  The large majority of LIPA's approximately 5500 MW peak load is concentrated in the western suburban portion of its service territory adjacent to New York City while the load in the eastern part of the service territory is less concentrated.[3]

37.    Long Island's existing, decades-old transmission infrastructure is ill-suited to meet the challenges presented by the Island's geography and the size and distribution of its load, and faces significant constraints transmitting energy generation to load.  Long Island's on-Island power plants are also among the oldest plants in the United States and have higher rates of forced outages compared to other regions.

---

[3] "Load" refers to an end-use device or customer that receives and uses power from the electric system.  A "load forecast" estimates the amount of power an electrical system will need to supply in order to meet anticipated customer demand.

38.     Because of these challenges, NYISO requires that LIPA guarantee that a certain percentage of its forecasted peak load be available from on-Island installed capacity ("ICAP") resources.  Known as the Locational Capacity Requirement ("LCR"), the requirement is updated annually.  In 2013, the LCR was 105%— in other words, LIPA was required to ensure that on-Island power plants (or off-Island power plants contracted to supply Long Island by cable) are capable of supplying at least 105% of the load LIPA expects during peak periods.  In 2014, the LCR was increased to 107%; in 2015, it was reduced to 103.5%, where it has remained since.  This year, NYISO has proposed changes to the LCR calculation methodology that would result in an increase to Long Island's LCR to 107.5%, above 2014 levels.

39.     In partial fulfillment of the LCR, the Authority has entered into a long-term Power Supply Agreement ("PSA") that entitles it to the entire capacity of the old, on-Island oil and gas-fired plants, and, on demand, to direct the plants to run for energy.

40.     In reality, although LIPA ensures *capacity* is available from these older plants, it often chooses not to purchase *energy* from these plants.[4]  Many of the plants covered by the PSA are inefficient, expensive to run, and highly polluting.  Thus, it is often cheaper for LIPA to meet its energy requirements in the day-ahead and real-time wholesale spot markets through other sources.  LIPA also purchases capacity and energy through long-term purchased power agreements ("PPAs") with a number of other plants.

41.     In 2016, 63 percent of LIPA's capacity requirements were met by the older, polluting plants, but those plants amounted to only 22 percent of LIPA's energy purchases.

---

[4] "Capacity" refers to a market commitment that a certain amount of generation will be available during a certain time period.  Utilities purchase capacity for a particular time period in order to guarantee that energy will be available during that time period if it is needed.  "Energy" refers to electrical output produced by generation plants that is ultimately delivered to customers for use in lighting, heating, air conditioning, and operation of other electrical equipment.

42.     From 2014 to 2016, roughly half of LIPA's energy purchases occurred on the wholesale spot markets in three regional power markets:

      a.     <u>NYISO</u>: NYISO operates New York's high-voltage transmission network and administers New York's wholesale electricity markets.

      b.     <u>ISO New England ("ISO-NE")</u>: ISO-NE is a regional transmission organization ("RTO") that coordinates the wholesale energy market for Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island and Vermont.

      c.     <u>PJM Interconnection ("PJM")</u>: PJM is the RTO that coordinates the wholesale energy market for all or parts of Delaware, Illinois, Indiana, Kentucky, Maryland, Michigan, New Jersey, North Carolina, Ohio, Pennsylvania, Tennessee, Virginia, West Virginia and the District of Columbia.

43.     Three cables connect Long Island to the ISO-NE and PJM markets and enable LIPA to obtain capacity and energy in those markets:

      a.     <u>Neptune Cable</u>: The Neptune Cable is a 660 MW High Voltage Direct Current (HVDC) submarine cable to New Jersey.  It began commercial operation in the summer of 2007.

      b.     <u>Cross Sound Cable</u>:  The Cross Sound Cable is a 330 MW HVDC submarine cable to New England.  It began commercial operation in 2002.

      c.     <u>Northport to Norwalk Cable</u>:  The Norwalk Cable is a 436 MW submarine cable to New England.  It began commercial operation in 2008, replacing a cable that originally was installed in 1969.

44.     A PSEG LI affiliate is responsible for bidding on capacity and energy in wholesale markets;[5] and scheduling transactions across the cables that connect LIPA's service area to PJM and ISO-NE.

## III.   LIPA'S 2010 REQUEST FOR PROPOSALS RECOGNIZED THE NEED FOR INCREASED CAPACITY AND ENERGY GENERATION ON LONG ISLAND.

45.     LIPA's 2010-2020 Electric Resource Plan, approved by the Authority's Board of Trustees in February 2010, concluded that the island would need additional electric generation capacity beginning in 2016 based on existing and projected electricity generation requirements established by the NYISO and the New York State Reliability Council.  According to the Authority's then-Chief Operating Officer, this determination reflected "several factors, including the need to meet reliability requirements to adequately serve load, our desire to repower and/or retire existing older, inefficient generation to improve system efficiency and reduce cost and air pollutant emissions, and to prepare the electric system on Long Island for greater penetrations of renewable energy resources."

46.     In short, faced with an increasing LCR and an aging fleet of plants that were economically inefficient to run—such as the E.F. Barrett and Port Jefferson power stations—LIPA recognized the need for modern, cost-effective, environmentally friendly, technologically advanced power generation resources.

47.     On August 20, 2010, the Authority launched an RFP to Provide Capacity, Energy & Ancillary Services, seeking proposals for the addition of 1,000 to 2,500 megawatts of new generating capacity for Long Island.

---

[5] In addition to acquiring energy and capacity through long-term PPAs, LIPA purchases energy in the wholesale, day-ahead and real-time spot energy markets, as well as in the capacity markets, to meet energy and capacity needs that exceed what LIPA already has a contractual right to obtain.

48.     LIPA assembled a selection committee comprised of experts from LIPA staff in the areas of power markets, environmental affairs, and legal.  The selection committee was assisted by outside expert resources retained to provide advice and technical support throughout the RFP development and evaluation process.  All work throughout the RFP process was overseen and validated by LIPA staff; no one from outside LIPA had a vote on the selection committee.

49.     The New York Power Authority worked with LIPA throughout the RFP process and endorsed the process and associated resource planning efforts.

50.     Before launching the RFP, the Authority prepared detailed specifications of the needs and parameters for the generation resource it sought, based on best-in-class modeling resources used internationally to forecast electrical system capacity and energy requirements.  It also adopted a comprehensive evaluation process designed to ensure that it methodically reviewed each proposal to determine whether it fulfilled Long Island's need to modernize its capacity and energy resources.

51.     LIPA conducted the review process in four phases:

a.      First, LIPA reviewed each proposal to determine whether it met the RFP requirements.

b.      Next, LIPA conducted an initial qualitative and quantitative evaluation of each proposal.  As part of that review, it calculated the Levelized Cost for each proposal, taking into account various factors including PPA charges, the types of technology involved, the costs incurred or reimbursed by LIPA for transmission reinforcements, and costs incurred by LIPA for gas supply and transportation, including interconnection costs and facility upgrades.

c.     Then, LIPA performed extensive qualitative and quantitative evaluations of each of the remaining proposals.  It conducted comprehensive, all-in cost comparisons, and required that the remaining bidders respond to detailed questions regarding their proposals.  It also required that the bidders provide detailed operating information regarding the proposed facilities.

d.     Finally, LIPA conducted a portfolio analysis in which it analyzed groups of proposals as a portfolio to determine which provided the overall best value for the system.

52.     After each phase, LIPA determined which proposals merited promotion to the next phase in the review and eliminated any proposals that failed to meet the qualitative and qualitative standards that LIPA had set for the project.  Throughout the review process, each firm responded to numerous questions and detailed requests for additional information from LIPA. LIPA also requested formal presentations from the firms and conducted extensive interviews. LIPA also independently conducted rigorous analyses to determine the feasibility and suitability of each proposal.

53.     In response to the RFP, LIPA received 45 proposals from 16 firms, a far greater number than it anticipated.

IV.     THE CAITHNESS II PROPOSAL AND THE BENEFITS FOR LONG ISLAND.

54.     In the spring of 2011, Caithness II submitted four proposals in response to the RFP, each of a different size and configuration.  Before submitting the proposals, Caithness II worked with local stakeholders to ensure the proposals were feasible and supported locally.

55.     In October 2012, following a review process that lasted over a year, Caithness II learned that the Authority selected the largest plant it had proposed as one of two finalists that would proceed to the contract negotiation stage.  The size of the proposed Caithness II project

16

meant that LIPA would have the option to shut down and repower an old, inefficient, and polluting plant at Port Jefferson.

56.     The Authority deliberately selected more than one finalist in order to provide it with more flexibility during the contract negotiations. Each finalist was required to perform the necessary environmental review to confirm the proposed facility's environmental impact was acceptable.

57.     The Caithness II submission proposed a new 750 MW combined cycle power plant in Yaphank, New York, in the Town of Brookhaven.

58.     A Caithness affiliate already operated a power plant in Brookhaven. The existing Caithness plant operates pursuant to a 20-year PPA with the Authority that began in 2009 and has provided roughly 10 percent of LIPA's annual energy requirement since it came online.

59.     The Caithness II Plant was designed to be natural gas-fueled, with ultra-low sulfur diesel fuel as a backup. On completion, it would be more efficient than any existing power plant in New York State, freeing up enough gas to heat almost two hundred thousand Long Island homes per year.

60.     In addition, the Caithness II Plant was designed to employ state-of-the-art emissions controls, which would reduce the air emissions from power generation on Long Island. It would also be air cooled, making it the most water-conserving plant on Long Island.

61.     The Caithness II Plant would have significant economic benefits for the area as well. It would create a new source of real estate tax revenue for the Town of Brookhaven, the Longwood School District, and other local jurisdictions with virtually no burden on public services. The facility's construction would also create up to 500 construction jobs during the 30-

17

month construction period, resulting in almost two hundred million dollars in payroll and benefits to the Long Island construction industry.

62.     The site Caithness II proposed for the Plant is particularly well suited for the project. Contiguous to the existing Caithness plant and adjacent to LIPA's Sills Road Substation, it is part of a 103-acre parcel owned by Caithness affiliates that is near transmission facilities, zoned for industrial use, and farther from residences than other power plant sites on Long Island. This site is not home to any threatened or endangered species of plants or animals, is not adjacent to any parks, and is not in a deep-water recharge zone or any other sensitive environmental location. The site has good access to transportation infrastructure and is large enough to provide ample space for construction equipment requirements, material storage, and assembly areas. Because it is over 100 feet above sea level and more than five miles from the Atlantic Ocean and Long Island Sound, it is not vulnerable to storm surge or flooding, as the locations of Long Island's existing power resources traditionally have been. The size and location of the site lends itself to productive, safe construction, which would shorten project schedule and cost.

63.     Given its merits, the Caithness II Plant was supported by many local groups and organizations, including the New York League of Conservation Voters; the Long Island Association ("LIA"); Hauppauge Industrial Association ("HIA"); Building & Construction Trades Council of Nassau & Suffolk Counties; Sustainability Institute at Molloy College; Vision Long Island; Neighborhood Network; Board of Education, Longwood School District; Board of Fire Commissioners, Yaphank Fire District; Long Island Metro Business Action ("LIMBA"); Central Bellport Civic Association; and the Boys & Girls Club of the Bellport Area.

18

V.     **LIPA SELECTED CAITHNESS AS THE WINNER OF THE 2010 RFP.**

64.     On July 25, 2013, the Authority announced that the Caithness II Plant had won the 2010 RFP and negotiations began for a PPA with a view to putting the proposed plant in service in 2018.

65.     LIPA stated that it selected the Caithness II facility over the other finalists for several reasons:

a.     The Plant would provide "comparable, if not lower costs" to LIPA customers;

b.     The Plant would "provide the system added flexibility in assessing and addressing future system needs" by allowing "for plant retirements and repowering options"; and

c.     Negotiations with Caithness had "resulted in generally acceptable PPA terms and conditions."

66.     LIPA also recognized that the Caithness II facility would constitute a significant technological upgrade that would allow LIPA to better tailor the service area's energy consumption to its actual needs, to great economic and environmental effect. LIPA noted that the technology Caithness II proposed to employ in the plant—the "state of the art" General Electric 207FA.05 flexible combined cycle technology—allowed for "faster start-ups in order to respond to rapidly increasing system demands while permitting much lower output during times of low system demands."

67.     LIPA anticipated submitting the completed PPA and any other related agreements for Board of Trustees approval in the fall of 2014.

68.     The New York Power Authority conducted its own review of LIPA's selection process and the decision to develop the Caithness II facility. It concluded that LIPA's decision

to proceed with Caithness II was "prudent" and that no other alternative "would provide the same or better value to LIPA ratepayers in terms of cost, reliability, environmental quality, and certainty of completion." The New York Power Authority stated that its support was based on several factors, including:

a.    Economics: The New York Power Authority's economic evaluation concluded that Caithness II was the lowest cost alternative.

b.    Clear Capacity Need: Notwithstanding LIPA's significant energy efficiency investments, the New York Power Authority concluded that Long Island needed additional capacity to ensure overall system reliability. It noted that additional capacity might be needed as early as 2016.

c.    Emission Reduction: Caithness II would be the most efficient plant on Long Island. The New York Power Authority noted that it would result in lower levels of carbon dioxide, nitrogen dioxide, and other emissions and displace generation from less efficient, older units.

d.    Proven Technology: The New York Power Authority noted that Caithness II proposed to develop the project using General Electric Combustion turbines and a steam turbine generator. The New York Power Authority concluded that the proposed configuration and equipment were reliable and used throughout the world.

e.    Proven Developer: The New York Power Authority also endorsed Caithness as the proven developer that had already successfully developed an existing, 326 MW combine cycle plant in Yaphank that had operated reliably since 2009.

f.    Strong Community Support: The New York Power Authority indicated that the Town of Brookhaven was very supportive of the project.

g.      Completion Probability:  The New York Power Authority also endorsed

the project's high probability of being permitted and constructed on time.

69.      In September 2013, LIPA's auditors praised the rigor and depth of its energy

supply and capacity planning process, and the resulting RFP to identify new supply resources, as

"extensive," "robust," "well-grounded," and "sound."  Accordingly, the auditors recommended

that LIPA "maintain, to the extent possible, the current energy supply planning processes"

following the transfer of those responsibilities to PSEG LI.

70.      After LIPA announced its selection of the Caithness II proposal, LIPA and

Caithness II personnel remained in close contact regarding the project's progress and held

teleconferences every two weeks to review the status of the project and to finalize the terms of a

PPA.

71.      At the same time, Caithness II worked to obtain air and other permits for the

project, and cooperated with LIPA to finalize electric interconnection, gas transmission, and

other issues necessary to the completion of the PPA.

72.      On May 6, 2014, the Town of Brookhaven adopted a Final Environmental Impact

Statement for the Caithness II Plant and issued a Finding on June 10, 2014, by a vote of 6 to 1,

that the project would have no significant adverse environmental impacts.

73.      On June 26, 2014, the LIPA Board authorized the execution of a Reimbursement

Agreement with Iroquois Gas Transmission System, L.P. ("Iroquois") to cover Iroquois's costs

related to the permitting of a proposed gas transmission project to serve the Caithness II Plant.

74.      As late as July 2014, Caithness II and the Authority were on track to deliver a

completed PPA to the LIPA Board for formal approval in fall of 2014.

21

## VI.    CAITHNESS II POSED A COMPETITIVE THREAT TO PSEG.

75.    PSEG has acknowledged in SEC filings that "new additions of lower-cost or more efficient generation capacity could make" PSEG "plants less economical in the future," including by impacting "market prices" and PSEG's "competitiveness."

76.    If built, the Caithness II Plant would be precisely the kind of efficient generating capacity that would threaten PSEG's business.

77.    First, the availability of new generation on Long Island would impact clearing prices for energy in NYISO Region K covering Long Island.  Because of Long Island's proximity and transmission ties to the rest of the NYISO and the ISO-NE and PJM markets, the availability of new generation on Long Island would also impact clearing prices in each of these markets.  Because the Caithness II Plant would displace higher-cost generation in NYISO, ISO-NE, and PJM, it would reduce the clearing prices in each of those markets.  PSEG, which sells electricity at the clearing price in each of these markets, would face lower revenues and lower profits.

78.    Second, the availability of low-cost power from the Caithness II Plant would also reduce LIPA's need to import more expensive power from the PJM, NYISO, and ISO NE wholesale energy markets to meet its day-to-day energy needs.  Because at least certain of PSEG's plants are less efficient than the Caithness II Plant, its sales to LIPA would be displaced. Thus, not only would PSEG generally face lower prices in the PJM, NYISO, and ISO NE markets if the Caithness II project came on-line, PSEG would also be selling less energy to LIPA.

79.    In all, the construction of the Caithness II Plant would likely result in at least tens of millions of dollars less revenue for PSEG plants in the PJM, NYISO, and ISO NE markets.

22

80.    The economic threat of Caithness II to PSEG was exacerbated by the fact that PSEG had additional generation projects underway, which promised to add an additional 1,868 MW of capacity and energy supply to PSEG's already substantial portfolio:

a.    A 755 MW Keys Energy Center gas-fired combined cycle generating station in Maryland, estimated to be in service in 2018;

b.    the 540 MW Sewaren 7 dual-fueled combined cycle generating station in New Jersey, estimated to be in service in 2018;

c.    the 485 MW Bridgeport Harbor 5 gas-fired combined cycle generating station in Connecticut, estimated to be in service in 2019;

d.    the 56 MW Bethlehem Energy Center (BEC) combined cycle uprate in Albany, NY, estimated to be in service in 2019; and

e.    the 32 MW Bergen dual-fueled combined cycle uprate in New Jersey, estimated to be in service in 2020.

81.    The addition of more than 750 MW in generation from the Caithness II Plant would impact the clearing prices for power sold from each of these additional PSEG plants.

82.    The recent operating revenues of PSEG's power generation and marketing subsidiary, PSEG Power, reflect PSEG's financial exposure to lower prices. In 2016, for example, operating revenues fell $905 million due in large part to the fact that PJM's and ISO-NE's wholesale electricity prices reached their lowest levels since the market's creation. Overall, PJM's prices dropped 40% from 2014 to 2016. In ISO-NE, prices dropped 55% in that same period. PSEG was thus plainly motivated to avoid the further downward pressure on energy prices that would have occurred had Caithness II been allowed to proceed with the Plant.

VII.   DEFENDANTS' WRONGFUL CONDUCT AND ANTICOMPETITIVE SCHEME

83.     In mid-2014, faced with a substantial economic threat from the Caithness II Plant,

PSEG took advantage of PSEG LI's expanded influence with LIPA to induce LIPA to agree to

exclude Caithness II as a competitor to PSEG's own generating assets in NYISO, PJM, and ISO-

NE.

A.    **PSEG LI's Self-Interested and Pretextual Claims That Additional On-Island**
      **Capacity Would Not Benefit Long Island.**

84.     On August 14, 2014, just months before an expected PPA between the Authority

and Caithness II, PSEG LI issued a Resource Planning Criteria Review projecting that Long

Island would not need new capacity until 2019-2022, contrary to LIPA's earlier conclusion,

validated by independent third parties, that it would require new capacity as early as 2016-2018

in light of, among other things, the age and inefficiency of its legacy power generation resources.

Taking direct aim at Caithness II, PSEG LI also recommended "delay[ing] commitments on all

current RFPs" in order to "perform a full Integrated Resource Plan (IRP), expected to be

concluded by end of 2015." This Review was issued without any public comment or review and

seemingly without any comment by LIPA professional staff, consultants, or the experts at

NYPA.

85.     PSEG LI's 2014 representations also failed to disclose PSEG LI's glaring conflict

of interest in evaluating Caithness II and the substantial benefit to PSEG if LIPA terminated, or

even delayed, development of the Caithness II project.

86.     PSEG LI's undisclosed conflict of interest tainted its analysis. The 2014 review

focused on the question of whether LIPA needed additional on-Island capacity given existing

plants and projected future load. The review did not address the age, inefficiency, and poor

environmental status of this existing capacity. From PSEG's perspective this made economic

24

sense: the longer LIPA relied on obsolete and inefficient plants to meet its *capacity* needs, the longer LIPA would look to off-Island power suppliers—like PSEG—to meet its *energy* needs. And the longer new, efficient plants like Caithness II were avoided, the longer regional clearing prices that PSEG got for its energy would be insulated from the competitive impact of a cheaper energy source.

87.    But, as LIPA had previously recognized, and as is indisputable, the continued reliance on old and inefficient on-Island power plants comes with significant costs that are substantial, even if they may be irrelevant to PSEG's bottom-line.  Among these impacts are:

a.    High operating costs;

b.    High property taxes;

c.    Highly inefficient use of natural gas;

d.    Significant emissions of greenhouse gases and other air pollutants;

e.    Long start-up times, making them inefficient and expensive to use alongside renewable energy sources that have variable power outputs;

f.    Excessive groundwater usage and substantial withdrawals of sea water, harming aquatic habitats; and

g.    Considerable operating risks, given the plants' age and technological obsolescence.

88.    In 2013, just one year before PSEG LI recommended reversing course, LIPA's auditors found that retiring the older generation of on-Island plants would result in substantial cost savings "estimated to range from $100 million to more than $1 billion" over the term of the relevant LIPA contract, depending on which units LIPA chooses to retire.  And a later June 2015 survey identified serious reliability concerns with eleven plants dating to the 1950s through

1970s with which LIPA still has capacity and energy contracts. The survey warned that even apart from the plants' inefficiencies, poor air emissions, and exorbitant water usage, the shortage of replacement parts and susceptibility to coastal storms warranted retiring the plants "as soon as their generating capacity can be replaced."

89.     PSEG LI was able to induce LIPA to agree with the August 2014 recommendation that it cancel the 2010 RFP, including the development of Caithness II. In April 2017, PSEG LI issued a "draft Summary" of an "Integrated Resource Plan" purporting to analyze the proposed Caithness II Plant. But LIPA personnel continued to express their conviction that additional power generation on Long Island was necessary, that further study would reinforce this need, and that the Caithness II project would ultimately proceed, albeit on a delayed schedule.

90.     Again, however, PSEG LI had misleadingly made no effort to analyze the economic impact of developing the Caithness II Plant and, at the same time, retiring existing, out-of-date, on-Island facilities. Notably, PSEG LI's 2017 analysis conceded that LIPA had "ramp down rights" for these facilities. Nonetheless, PSEG LI never quantified the impact of ramping down one or more of these units in favor of the vastly more efficient Caithness II Plant.

91.     PSEG LI's 2017 analysis also again misleadingly failed to disclose the profits that PSEG stood to reap by blocking the replacement of obsolete and inefficient on-Island capacity as long as possible and in avoiding the construction of modern, cost-effective plants like the Caithness II Plant.

92.     In addition, PSEG LI did not account for the possibility that there might be an increased need for additional on-Island capacity in the event NYISO increased Long Island's

LCR once more to 2014 levels. Indeed, NYISO has proposed methodological changes to LCR calculations that would produce that very result.

93.     PSEG LI has misleadingly pointed to work by the Brattle Group as a supposedly independent confirmation of the merits of its analysis of the Caithness II project. The Brattle Group, a well-known litigation consulting firm that provides expert witnesses to advance a party's case at trial, was not hired as an independent consultant, and its conclusions were heavily influenced by Defendants. Brattle was hired in early 2017 after it was clear that litigation was likely regarding PSEG LI's efforts to delay and derail the Caithness II plant.

94.     The Brattle Report concedes that Brattle just took PSEG LI's prior tainted work product and purported to evaluate "the reasonableness of those findings" *without conducting "independent system modeling analyses of Long Island's needs nor of the NYISO power pool and surrounding markets."* Brattle also noted that, like PSEG LI's own prior analyses, "One possibility we did not explore is *whether CLI-II would be attractive if it were built and some similar amount of older PSA capacity was shut-down and demolished.*"

95.     Moreover, even accounting for the narrow question Brattle was asked, Brattle's "answer" was no more than: "we do not find a compelling reason for LIPA to proceed with" Caithness II. And nowhere in its report does Brattle address PSEG LI's clear conflict of interest in assessing the need for Caithness II or the obvious risk that this conflict tainted the analyses that Brattle took as the starting point for its work.

**B.     Defendants' Misrepresentations and Omissions.**

96.     PSEG and PSEG LI have relied on misrepresentations and omissions to induce LIPA to agree to delay and derail the Caithness II Plant.

97.     In conducting resource planning for LIPA and assessing the merits of the Caithness II project, PSEG LI has hidden its conflict of interest and the tens of millions of dollars

27

of PSEG profits that are stake. As noted above, none of PSEG LI's analyses of LIPA's need for future on-Island capacity disclosed PSEG's strong financial interest in having LIPA rely on obsolete and inefficient plants to meet its *capacity* needs as long as possible so that LIPA would continue to rely on off-Island power suppliers—like PSEG—to meet its *energy* needs.

98.     PSEG LI has also denied any conflict of interest by misleadingly representing that "PSEG has no direct contracts to sell power to LIPA." PSEG LI has also misleadingly represented that PSEG has "no ability to profit" from cable purchases by LIPA and "no say to whom" its "power is delivered." In fact, even without direct contracts, LIPA routinely imports electricity to Long Island through the operation of the regional energy markets—indeed approximately half of LIPA's energy needs are supplied through such imports. These imports occur over the cables that connect Long Island to the ISO-NE and PJM markets. And, a sophisticated party like PSEG certainly understands that power from its plants is imported from New Jersey and Connecticut to Long Island, and that PSEG profits from such sales (as well as from the beneficial price effects in those regions from which the energy is exported), regardless of whether PSEG is specifically directing where any specific electron flows.

99.     In 2015, PSEG LI submitted to the NYISO a Long Island Local Reliability Interface Transfer Capability Test (the "Long Island Guideline") to identify system upgrades that would be required for projects, like Caithness II, proposing to interconnect on Long Island. The Long Island Guideline purported to impose on Caithness II two levels of interconnection service. This meant, according to PSEG LI, Caithness II was required to pay for hundreds of millions of dollars in interconnection costs. Accounting for these costs had the impact of dramatically undermining the economic benefits of the Caithness II Plant.

100.    In fact, PSEG LI's claim that both interconnection requirements applied to
Caithness II was false.  On September 30, 2015, FERC agreed.  It ruled in a unanimous 5-0 vote
that PSEG LI's attempt to put Caithness II on the hook for the hundreds of millions in extra
interconnection charges was inconsistent with FERC Order No. 2003 and violated the NYISO
regulation.  LIPA's request for rehearing was also denied by unanimous vote.

101.    The correct estimate of the required interconnection costs for Caithness is less
than $50 million.  In falsely claiming Caithness II was required to absorb hundreds of millions of
dollars in interconnection costs, PSEG LI was attempting to derail the Caithness II project by
framing it as prohibitively costly.

102.    Even after FERC rejected their position, PSEG LI induced LIPA to agree that, as
a condition of a PPA, the Caithness II project would have to fund the entirety of the
interconnection upgrade costs that FERC had ruled that Caithness II did *not* have an obligation to
absorb.  This position too was part of Defendants' scheme to derail Caithness II—as confirmed
by the fact that, even in the absence of the Caithness II project, LIPA has begun to implement
and pay for hundreds of millions of dollars of the same transmission system upgrades that PSEG
LI had previously claimed were needed because the Caithness II Plant was being built.

## VIII.  THE ANTICOMPETITIVE EFFECTS OF DEFENDANTS' WRONGFUL CONDUCT.

103.    But for Defendants' anticompetitive conduct and agreements, the Caithness II
Plant would have continued to move forward towards a final PPA, construction, and commercial
operation, just as had been occurring before Defendants wrongfully intervened.

104.    PSEG and PSEG LI's efforts to interfere with the Caithness II Plant, and LIPA's
agreement with Defendants to delay and then cancel the 2010 RFP, including the development of
the Caithness II Plaint, has foreclosed Caithness II from entering the Long Island market for

energy and capacity. This foreclosure will extend, at a minimum, for years beyond the original 2018 target date for commercial operation of the Caithness II Plant.

105.    Given the barriers to entry that Defendants have created, the Caithness II Plant will never be able to move forward as planned. Although Caithness II continues to try to salvage its investment by exploring the possibility of building a merchant plant (*i.e.*, a plant that buys and sells energy or capacity in the wholesale markets without a long-term contract); the economics of constructing such a plant in the absence of a long-term capacity commitment mean that, at best, the plant will be substantially smaller than the Caithness II Plant LIPA selected in the RFP.

106.    Thus, in all events, Defendants will have eliminated competition from substantial, efficient on-Island capacity and the attendant downward energy pricing pressure that such additional capacity presents. Moreover, there remain enormous challenges for Caithness II in trying to make even a smaller project economic as a merchant plant. PSEG well understands this reality: in similar circumstances, PSEG has made clear that it required long-term capacity commitments for its projects because merchant plants are economically infeasible.

## CLAIMS FOR RELIEF

### Claim I
### 15 U.S.C. § 1
### (Contract, Combination, or Conspiracy)

107.    Plaintiffs hereby restate Paragraphs 1 through 106 of this Complaint.

108.    PSEG LI, PSEG, and LIPA entered into and engaged in a contract, combination, and conspiracy to delay and then terminate the 2010 RFP, including the development of the Caithness II project. This contract, combination, and conspiracy was an unreasonable and unlawful restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, *et seq.*

109.    PSEG LI's participation in this contract, combination, and conspiracy was beyond the scope of its responsibilities as a service provider of LIPA; its wrongful conduct was in furtherance of the economic interests of its affiliate PSEG on whose behalf it was acting.

110.    The contract, combination, and conspiracy to delay and then terminate the 2010 RFP, including the development of the Caithness II project, caused injury to Plaintiffs by foreclosing their ability to participate in the capacity and energy generation markets on Long Island (NYISO Region K), in Eastern PJM, in Southeastern ISO NE, and/or in other parts of NYISO.

111.    The contract, combination, and conspiracy to delay and then terminate the 2010 RFP, including the development of the Caithness II project resulted in substantial anticompetitive effects in the capacity and energy generation markets on Long Island, in Eastern PJM, in Southeastern ISO NE, and/or in other parts of NYISO.

112.    There is no legitimate business justification for, or pro-competitive benefits from, PSEG's and PSEG LI's conduct.

113.    As a direct and proximate result of PSEG's and PSEG LI's violations of Section 1 of the Sherman Act, Plaintiffs have suffered injuries to their businesses and property.

## Claim II
## N.Y. Gen. Bus. Law § 340
### (Anticompetitive Contract, Agreement, Arrangement and/or Combination)

114.    Plaintiffs hereby restate Paragraphs 1 through 113 of this Complaint.

115.    PSEG LI, PSEG, and LIPA entered into and engaged in a contract, agreement, arrangement, combination, and conspiracy to delay and then terminate the 2010 RFP, including the development of the Caithness II project.  This contract, agreement, arrangement,

combination, and conspiracy was an unreasonable and unlawful restraint of trade in violation of the Donnelly Act, N.Y. Gen. Bus. Law § 340.

116.   PSEG LI's participation in this contract, agreement, arrangement, combination, and conspiracy was beyond the scope of its responsibilities as a service provider of LIPA; its wrongful conduct was in furtherance of the economic interests of its affiliate PSEG on whose behalf it was acting.

117.   The contract, agreement, arrangement, combination, and conspiracy to delay and then terminate the 2010 RFP, including the development of the Caithness II project, caused injury to Plaintiffs by foreclosing their ability to participate in the capacity and energy generation markets on Long Island (NYISO Region K), in Eastern PJM, in Southeastern ISO NE, and/or in other parts of NYISO.

118.   The contract, agreement, arrangement, combination, and conspiracy to delay and then terminate the 2010 RFP, including the development of the Caithness II project, resulted in substantial anticompetitive effects in the capacity and energy generation markets on Long Island, in Eastern PJM, in Southeastern ISO NE, and/or in other parts of NYISO.

119.   There is no legitimate business justification for, or pro-competitive benefits from, PSEG's and PSEG LI's conduct.

120.   As a direct and proximate result of PSEG's and PSEG LI's violations of the Donnelly Act, Plaintiffs have suffered injuries to their businesses and property.

### Claim III

### Tortious Interference with Prospective Business Relations

121.   Plaintiffs hereby restate Paragraphs 1 through 120 of this Complaint.

122.   Plaintiffs had prospective business relations with LIPA.  In July 2013, Caithness II was selected by the Authority under a competitive 2010 RFP as the best project to meet LIPA's capacity and energy requirements.  In mid-2014, a PPA between the Authority and Caithness II was close to being finalized, project permits were set to be completed in the first half of 2015, and construction of the Caithness II Plant was to commence in the second half of 2015.

123.   Defendants wrongfully interfered with that prospective business relationship when, *inter alia:*

a.   PSEG LI issued an August 2014 analysis knowingly falsely concluding that LIPA had sufficient resources to satisfy electricity demand, and recommending that LIPA put the Caithness II project on hold, without disclosing, as PSEG LI was obligated to do, that PSEG stood to profit from this recommendation and without otherwise taking steps to avoid the taint from PSEG LI's disabling conflict of interest with respect to these issues;

b.   PSEG LI repeatedly knowingly falsely asserted that LIPA did not need the Caithness II project, and that LIPA should terminate this project, without disclosing, as PSEG LI was obligated to do, that PSEG stood to profit from this recommendation or otherwise taking steps to avoid the taint from PSEG LI's disabling conflict of interest with respect to these issues;

c.   Defendants knowingly misrepresented the facts concerning their disabling conflict of interest regarding LIPA's need for the Caithness II project;

33

    d.    PSEG LI knowingly falsely claimed that Caithness II would be required to pay for interconnection upgrades that were many hundreds of millions of dollars higher than governing standards required—a claim rejected by FERC;

    e.    Even after PSEG LI's false claim to the NYISO had been rejected by FERC, Defendants continued to knowingly falsely represent to LIPA and others that these upgrades were needed because of the Caithness II Plant, and thus that LIPA should make these upgrades a precondition of a PPA with Caithness II, even though PSEG LI and LIPA are proceeding with such upgrades even in the absence of the Caithness II Plaint.

124.    Defendants' conduct was undertaken for a wrongful purpose.  Defendants were seeking to halt the development of Caithness II and (a) avoid additional output on Long Island that would depress clearing prices in the NYISO, JPM, and ISO-NE energy markets in which PSEG sold power, and (b) maximize the amount of power that LIPA purchased from plants owned by PSEG.  Defendants achieved this goal in or about July 2017, when LIPA terminated the 2010 RFP, including the development of the Caithness II project, and eliminated Plaintiffs' business opportunity with LIPA.

125.    But for Defendants' wrongful conduct, LIPA would not have delayed and then terminated the 2010 RFP, including the development of the Caithness II project, and Caithness II would have entered into the PPA that had been contemplated when Caithness II was selected as the winner of the 2010 RFP.

126.    Defendants' acts injured Caithness's business relationships with LIPA and caused actual economic loss to Caithness.

34

## PRAYER FOR RELIEF

127.   To remedy these illegal acts, Plaintiffs request that the Court:

    a.    For Claim I, award compensatory and trebled damages in favor of Plaintiffs and against Defendants, including all interest thereon;

    b.    For Claim II, award compensatory and trebled damages in favor of Plaintiffs and against Defendants, including all interest thereon;

    c.    For Claim III, award compensatory and punitive damages in favor of Plaintiffs and against Defendants, including all interest thereon.

    d.    Award Plaintiffs reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

     e.     Grant any such further relief as the Court deems appropriate.

Dated: New York, New York
      August 13, 2018

                                  Respectfully submitted,

                                  BOIES SCHILLER FLEXNER LLP

By: _____

                                  David Boies
                                  333 Main Street
                                  Armonk, NY 10504
                                  Telephone: (914) 749-8200
                                  Facsimile: (914) 749-8300
                                  dboies@bsfllp.com

                                  Philip C. Korologos
                                  Eric Brenner
                                  575 Lexington Avenue
                                  New York, New York 10022
                                  Telephone: 212-446-2300
                                  Facsimile: 212-446-2350
                                  pkorologos@bsfllp.com
                                  ebrenner@bsfllp.com

                                  *Attorneys for Caithness Energy, LLC and Caithness Long Island II, LLC*