```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
CAITHNESS LONG ISLAND II, LLC and
CAITHNESS ENERGY, LLC,

                    Plaintiffs,
                                        MEMORANDUM & ORDER
          -against-                     18-CV-4555(JS)(AYS)

PSEG LONG ISLAND LLC and PUBLIC
SERVICE ENTERPRISE GROUP INCORPORATED,

                    Defendants.
----------------------------------X
APPEARANCES
For Plaintiffs:     David Boies, Esq.
                    Eric Brenner, Esq.
                    Philip C. Korologos, Esq.
                    Boies, Schiller, Flexner, LLP
                    333 Main Street
                    Armonk, New York 10504

For Defendants:     Allyson M. Maltas, Esq.
                    Marguerite Sullivan, Esq.
                    Lawrence Edward Buterman, Esq.
                    Latham & Watkins LLP
                    555 Eleventh Street, NW
                    Suite 1000
                    Washington, DC 20004
```

SEYBERT, District Judge:

In this antitrust action, defendants Public Service Enterprise Group Incorporated ("PSEG") and PSEG Long Island LLC ("PSEG LI" and together, "Defendants") move to dismiss (Mot., D.E. 17) the Complaint of plaintiffs Caithness Long Island II, LLC ("Caithness II") and Caithness Energy, LLC ("Caithness" and together, "Plaintiffs"). For the following reasons, the motion is GRANTED.

BACKGROUND

The Court takes the following facts from the Complaint as true and construes them in the light most favorable to Plaintiffs.[1]

Plaintiff Caithness is a power producer. (Compl. ¶ 17.) It currently operates a power plant in the Town of Brookhaven on Long Island. The existing Caithness plant operates under a 20-year PPA[2] with LIPA and provides approximately 10% of LIPA's annual energy requirement. (Compl. ¶¶ 2, 58.) Plaintiff Caithness II is a wholly owned subsidiary of Caithness formed to develop an additional plant in Brookhaven. (Compl. ¶¶ 2, 18.) Defendant PSEG is a corporation whose subsidiary, PSE&G, "is one of the largest public utilities in the United States and provides electric and gas transmission and distribution ("T&D") to residential, commercial, and industrial customers." Defendant PSEG LI, a wholly owned PSEG subsidiary, operates a T&D system on Long Island. (Compl. ¶¶ 19-20.)

The Long Island Power Authority ("LIPA") was established by the Long Island Power Authority Act in 1986. It is governed by a nine-person Board of Trustees--five appointed by the Governor,

---

[1] PSEG "disputes many of the facts contained in the Complaint" but acknowledges that for purposes of this motion it must accept them as true. (Def. Br., D.E. 17-1, at 4 n.2.)

[2] "PPA's" are long-term purchased power agreements. (Compl. ¶ 40.)

two by the Majority Leader of the New York State Senate, and two by the Speaker of the New York State Assembly. (Compl. ¶¶ 26-27.) The Long Island Lighting Company ("LILCO") is LIPA's subsidiary. (Compl. ¶ 3.) Through LILCO's T&D system, LIPA provides electric service to 1.1 million people in Nassau and Suffolk Counties and the Rockaways. (Compl. ¶ 26.) LILCO has a contractual service provider to manage and operate its T&D system; for many years, it was National Grid, LLC ("National Grid"), but in 2011, LILCO entered into a ten-year contract with Defendant PSEG LI to "operate[ ] LIPA's electric T&D system." (Compl. ¶¶ 28-29, 20.) In 2013, the State Legislature passed the LIPA Reform Act that gave PSEG LI an "increased role" with "significant operational flexibility to manage capital expenditures, budgets, and emergency response preparedness . . . ." (Compl. ¶ 31.) The Reform Act also reduced LIPA's staff, which currently has 49 people. PSEG LI has 2,350 employees, 20 at director level or above. (Compl. ¶ 32.)

In addition, "[a] PSEG LI affiliate is responsible for bidding on capacity and energy in the wholesale markets." (Compl. ¶ 44.) "From 2014 to 2016, roughly half of LIPA's energy purchases occurred on the wholesale spot market in three regional power markets:"

> [The New York Independent System Operator]
> 'NYISO' operates New York's high-voltage

3

> transmission network and administers New York's wholesale electricity markets.
> [The Independent System Operator-New England] 'ISO-NE' is a regional transmission organization ('RTO') that coordinates the wholesale energy market for Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont.
> [The PJM Interconnection] 'PJM' is the RTO that coordinates the wholesale energy market for all or parts of Delaware, Illinois, Indiana, Kentucky, Maryland, Michigan, New Jersey, North Carolina, Ohio, Pennsylvania, Tennessee, Virginia, West Virginia, and the District of Columbia.

(Compl. ¶ 42.)

In 2010, before the contract with PSEG LI, LIPA issued a request for proposals ("RFP") "for the addition of 1,000 to 2,500 megawatts of new generating capacity for Long Island."[3] (Compl. ¶ 47.) This was in response to a 2010-2020 LIPA Electric Resource Plan finding that Long Island would need additional electric generation capacity starting in 2016. (Compl. ¶ 45.) In forming the plan, LIPA "prepared detailed specifications of the needs and parameters for the generation resource it sought" and "assembled a selection committee comprised of experts from LIPA staff . . . assisted by outside expert resources . . . ." (Compl. ¶¶ 50, 48.) LIPA received 45 proposals from 16 firms, including four from Caithness II. (Compl. ¶¶ 53, 54.)

---

[3] "'Capacity' refers to a market commitment that a certain amount of generation will be available during a certain time period." (Compl. ¶ 40 n.4.)

4

On July 25, 2013, after a lengthy and careful review process, LIPA selected one of Caithness II's proposals. (Compl. ¶ 64.) The New York Power Authority[4] reviewed and supported the selection. (Compl. ¶ 68.) LIPA stated that Cathess "would provide comparable, if not lower costs" to customers. (Compl. ¶ 65.) LIPA and Caithness II began to negotiate a power purchase agreement ("PPA"), (Compl. 64), with a goal of submitting a finalized contract to the Board of Trustees in the fall of 2014, (Compl. ¶ 64).

Critically to this case, no agreement was reached and no contract was formed. On August 14, 2014, after the passage of the LIPA Reform Act and PSEG LI's increased role, PSEG LI issued a review "projecting that Long Island would not need new capacity until 2019-2022." PSEG LI's review recommended delaying commitments on all current RFPs. (Compl. ¶ 84.) In July 2017, LIPA terminated this RFP. (Compl. ¶ 124.) Plaintiffs allege that they "will never be able to move forward as planned" but "continue[ ] to try to salvage its investment by exploring the possibility of building a merchant plant . . . that buys and sells energy . . . without a long-term contract." (Compl. ¶ 105.)

According to Plaintiffs, the proposed Caithness II plant would "threaten PSEG's business" and "likely result in at least

---

[4] Long Island's power system "has only limited ties" to the rest of the New York State system. (Compl. ¶ 36.)

5

tens of millions of dollars less revenue for PSEG plants in the PJM, NYISO, and ISO NE markets." (Compl. ¶¶ 76, 79.) PSEG stated in SEC filings that additional more efficient plants could make PSEG plants less economical by "impacting market prices and PSEG's competitiveness." (Compl. ¶ 75.) Plaintiffs state that Long Island's power system is aging and inefficient, (Compl. ¶¶ 37, 46), and that Caithness II would have been "more efficient than any existing power plant in New York," (Compl. ¶ 59). They contend that "Defendants used their influence over LIPA, and their false and misleading statements to LIPA, to induce LIPA to agree with, and participate in, PSEG LI's anti-competitive efforts to derail the Caithness II plant, and to agree to cancel the 2010 RFP, including the development of the Caithness II project." (Compl. ¶ 14.) Plaintiffs further allege that Defendants "failed to disclose PSEG LI's glaring conflict of interest in evaluating Caithness II and the substantial benefit to PSEG if LIPA terminated . . . development of the Caithness II project." (Compl. ¶ 85.) Plaintiffs repeatedly allege that Defendants misled LIPA to induce LIPA to pull out of the project. (See Compl. ¶¶ 14, 90-91, 93, 96-98.)

Plaintiffs claim that (1) Defendants and LIPA entered into and engaged in a contract, combination, and conspiracy to delay and then terminate the 2010 RFP, which was an unreasonable and unlawful restraint of trade in violation of the Sherman Act,

6

15 U.S.C. § 1, et seq.; (2) this conduct also violated the Donnelly Act, N.Y. Gen. Bus. Law § 340; and (3) Defendants tortiously interfered with the prospective business relations between Plaintiffs and LIPA. (Compl. ¶¶ 107-26.)

## DISCUSSION

I. Motion to Dismiss

To withstand a motion to dismiss, a complaint must contain factual allegations that "'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007)). This plausibility standard is not a "probability requirement" and requires "more than a sheer possibility that a defendant has acted unlawfully." Id. (internal quotation marks and citation omitted). "To survive a motion to dismiss under Twombly, it is not enough to make allegations of an antitrust conspiracy that are consistent with an unlawful agreement; to be viable, a complaint must contain enough factual matter (taken as true) to suggest that an agreement to engage in anticompetitive conduct was made." In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007) (internal quotation marks and citation omitted).

7

II. <u>Sherman Act (Count I) and New York General Business Law Section 340 (Count II)</u>

The federal and state antitrust claims are subject to similar analysis on a motion to dismiss. <u>See</u> <u>Menkes v. St. Lawrence Seaway Pilots' Ass'n</u>, 269 F. App'x 54, 55 n.3 (2d Cir. 2008) ("New York's Donnelly Act, N.Y. Gen. Bus. L. § 340, is modeled on the Sherman Act and generally is construed in accordance with federal precedent"); <u>Anheuser-Busch, Inc. v. Abrams</u>, 71 N.Y.2d 327, 335, 520 N.E.2d 535, 539, 525 N.Y.S.2d 816 (1988) ("Although we do not move in lockstep with the Federal courts in our interpretation of antitrust law, the Donnelly Act--often called a 'Little Sherman Act'--should generally be construed in light of Federal precedent and given a different interpretation only where State policy, differences in the statutory language or the legislative history justify such a result.") (internal citations omitted). Here, neither party "assert[s] any State policy that would justify construing the Donnelly Act differently from the Sherman Act in this case" and the Court analyzes the claims together. <u>Menkes</u>, 269 F. App'x at 55 n.3.

> "The Sherman Act prohibits, <u>inter</u> <u>alia</u>, every contract, combination, or conspiracy, in restraint of trade or commerce among the several States.
> Because § 1 of the Sherman Act does not prohibit all unreasonable restraints of trade . . . but only restraints effected by a contract, combination, or conspiracy, the crucial question is whether the challenged anticompetitive conduct stems from

8

independent decision or from an agreement, tacit or express." Anderson News, L.L.C. v. Am. Media, Inc., 680 F.3d 162, 182 (2d Cir. 2012) (internal quotation marks, citations, and alterations omitted). "Circumstances must reveal a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 764, 104 S. Ct. 1464, 1471, 79 L. Ed. 2d 775 (1984) (internal quotation marks and citation omitted).

Recognizing that "conspiracies are rarely evidenced by explicit agreements, but nearly always must be proven through inferences that may fairly be drawn from the behavior of the alleged conspirators," the Second Circuit has nevertheless held that "[a]t the pleading stage, a complaint claiming conspiracy, to be plausible, must plead enough factual matter (taken as true) to suggest that an agreement was made, i.e., it must provide some factual context suggesting that the parties reached an agreement, not facts that would be merely consistent with an agreement." Anderson News, 680 F.3d at 184-85 (internal quotation marks, citations, and alterations omitted). However, "[a]sking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will

9

reveal evidence of illegal agreement." Twombly, 550 U.S. at 556, 127 S. Ct. at 1965.

A.  No Meeting of the Minds

"In order to prove a conspiracy, 'the antitrust plaintiff should present direct or circumstantial evidence that reasonably tends to prove that the defendant and others had a conscious commitment to a common scheme designed to achieve an unlawful objective." Anderson News, 680 F.3d at 184 (quoting Monsanto, 465 U.S. at 764, 104 S. Ct. at 1463) (emphasis omitted). Here, Plaintiffs' allegations tend to show that LIPA and Defendants could not have had a conscious commitment to a common scheme, because they plead that Defendants misled LIPA. LIPA could not have united with PSEG toward a common unlawful goal if LIPA was unaware of that purported goal.

Although the Complaint repeatedly alleges that Defendants misled LIPA into taking anticompetitive action, Plaintiffs' opposition to Defendants' motion appears to cast that action in a new light: it states that "regardless of whether LIPA was initially misled by PSEG LI regarding the merits of the Caithness II project, the Complaint supports the inference that LIPA's ultimate acquiescence in the anticompetitive scheme was made with open eyes." Plaintiffs argue this demonstrates that "regardless of whether LIPA was initially deceived, as alleged, LIPA acted intentionally in conspiring to eliminate competition

10

from Caithness II." (Pl. Br. at 9.) However, this purported leap is not explained in the Complaint. Nowhere does it allege that LIPA moved from being duped by Defendants to actively conspiring with Defendants.

The Complaint is also devoid of allegations of meetings, communications, or people who allegedly discussed the decision. Cf. Anderson News, 680 F.3d at 187 (holding complaint plausibly pled antitrust conspiracy where it alleged on "various dates within the preceding two-week period defendants and [others]--through their executives, 10 of whose names or positions are specified-- had met or communicated with their competitors and others and made statements that may plausibly be interpreted as evincing their agreement"). Additionally, an antitrust "plaintiff's complaint can be dismissed where there is an obvious alternative explanation to the facts underlying the alleged conspiracy among the defendants." Cenedella v. Metro. Museum of Art, 348 F. Supp. 3d 346, 358 (S.D.N.Y. 2018). Here, the Court finds that a strong alternative explanation for cancelling the RFP is that Defendants, newly given more authority under the LIPA Reform Act, undertook a review of all existing projects and concluded that the plant was not necessary at that time. Thus, Plaintiffs have not adequately alleged a meeting of the minds sufficient to plausibly allege violations of the Sherman Act or the Donnelly Act.

11

B.   **The Rule of Reason Requires an Antitrust Injury and a Relevant Market**

Next, though the Court does not find that Plaintiffs have adequately alleged the requisite meeting of the minds, even "assum[ing] the existence of a conspiracy," the Complaint does not contain sufficient allegations of an unreasonable restraint of trade. N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc., 883 F.3d 32, 39 n.10 (2d Cir. 2018). "'The question whether an arrangement is a contract, combination, or conspiracy is different from and antecedent to the question whether it unreasonably restrains trade.'" N. Am. Soccer League, 883 F.3d at 39 n.10 (quoting Am. Needle, Inc. v. Nat'l Football League, 560 U.S. 183, 186, 130 S. Ct. 2201, 2206, 176 L. Ed. 2d 947 (2010)). A restraint can be per se unreasonable or can violate the "Rule of Reason." See N. Am. Soccer League, LLC, 883 F.3d at 41. Plaintiffs do not claim that this case falls within the class of restraints held to be per se unreasonable, so the Rule of Reason applies. "'The rule-of-reason inquiry requires, at the motion to dismiss stage, that the plaintiff identify the relevant market affected by the challenged conduct and allege an actual adverse effect on competition in the identified market.'" Cenedella, 348 F. Supp. 3d at 360 (quoting Watkins v. Smith, No. 12-CV-4635, 2012 WL 5868395, at *7 (S.D.N.Y. Nov. 19, 2012), aff'd, 561 F. App'x 46 (2d Cir. 2014)).

1. <u>No Antitrust Injury</u>

Plaintiffs allege that "Caithness and Caithness II have suffered hundreds of millions of dollars of harm as a direct and proximate cause of PSEG and PSEG LI's wrongful conduct." (Compl. ¶ 16.) They also allege that "Defendants' actions have had and are continuing to have a substantial adverse effect on competition in the market to supply electricity to Long Island and thereby have harmed consumers." (Compl. ¶ 24.) Defendants counter that even if LIPA and PSEG "together agreed not to act on the 2010 RFP . . . [Plaintiffs'] claim fails under the rule of reason because its allegation that LIPA refused to contract with Caithness states only an injury to Caithness, not an injury to competition as a whole." (Def. Br. at 11.)

"In order to allege a § 1 violation under the rule of reason sufficient to overcome a motion to dismiss, a plaintiff must plead facts that plausibly suggest 'that the challenged action has had an <u>actual</u> adverse effect on competition as a whole in the relevant market; to prove it has been harmed as an individual competitor will not suffice.'" <u>Abbott Labs. v. Adelphia Supply USA</u>, No. 15-CV-5826, 2017 WL 5992355, at *5 (E.D.N.Y. Aug. 10, 2017) (quoting <u>Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.</u>, 996 F.2d 537, 543 (2d Cir. 1993)) (emphasis in original). Plaintiffs can do so either by demonstrating an actual adverse effect through "increased prices, reduced quality, or

13

reduced outputs" or, if unable to show actual effects, "indirectly, by pleading that a defendant had market power plus some other ground for believing that the challenged behavior could harm competition in the market, such as the inherent anticompetitive nature of the defendant's behavior." Id. at 6 (internal quotation marks and citation omitted).

"[T]he adverse effect on competition is a requirement that must be alleged at the pleading stage and can be the basis for a motion to dismiss." Integrated Sys. & Power, Inc. v. Honeywell Int'l, Inc., 713 F. Supp. 2d 286, 299 (S.D.N.Y. 2010) (dismissing complaint without prejudice where the plaintiff failed to allege an antitrust injury and relevant product market). Plaintiffs' conclusory claim that cancelling the RFP had and continues to have an adverse impact on the electricity market on Long Island is not supported by sufficient facts to plausibly allege injury, especially where Plaintiffs already operate another plant in the relevant market.

2. Relevant Market

"Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market." Todd v. Exxon Corp., 275 F.3d 191, 199-200 (2d Cir. 2001). The Complaint references "capacity and energy generation markets," (Compl. ¶¶ 110, 117), and "Long Island," (Compl. ¶¶ 24, 104, 110, 117). The Court finds

14

that Plaintiffs have thus plausibly alleged a product and geographic market.

    C. Remaining Arguments

In light of the above, the Court does not reach Defendants' remaining arguments regarding (1) the statute of limitations (2) Federal Energy Regulatory Commission (FERC) preemption, and (3) the Noerr-Pennington doctrine. (Def. Br. at 18-19, 22-26, 26-28.) Accordingly, Counts I and II are DISMISSED without prejudice.

III. Tortious Interference with Prospective Business Relations (Count III)

The Second Circuit recently summarized the requirements for tortious interference with prospective business relations[5] in the antitrust context:

> Under New York law, a plaintiff claiming tortious interference with prospective business relations must show the defendant's interference with business relations existing between the plaintiff and a third party, either with the sole purpose of harming the plaintiff or by means that are dishonest, unfair, or in any other way improper. But where, as it does here, the defendant's interference is intended, at least in part, to advance its own competing interests, the claim will fail unless the means employed include criminal or fraudulent conduct.

---

[5] Although Plaintiffs' tortious interference claim may be inconsistent with its antitrust claims, Federal Rule of Civil Procedure Rule 8 allows that "[a] party may state as many separate claims or defenses as it has, regardless of consistency."

15

IQ Dental Supply, Inc. v. Henry Schein, Inc., No. 18-CV-175, 2019 WL 2063559, at *9 (2d Cir. May 10, 2019) (internal quotation marks, citations, and emphases omitted).

Here, Plaintiffs allege that PSEG LI's interference was "intended . . . to advance its own competing interests." Id. Thus, PSEG must have interfered with criminal or fraudulent conduct. Taking the allegations in the Complaint as true, the Court finds that Plaintiffs have stated that PSEG interfered with the LIPA/Caithness II RFP through fraudulent conduct. (See, e.g. Compl. ¶¶ 14, 90-91, 93, 96-98.)

Defendants argue, however, that Plaintiffs have failed to establish another threshold requirement: interference with a relationship between Plaintiffs and a third party. They contend that LIPA is not a third party because "the Complaint clearly alleges that PSEG LI was acting [as an agent] on [principal] LIPA's behalf" and that PSEG's recommendations were within the scope of its authority as LIPA's agent. (Def. Reply, D.E. 20, at 9.) Under New York law, an agent is typically not liable for inducing its principal to breach a contract if the agent is acting within the scope of its authority. See Solow v. Stone, 994 F. Supp. 173, 181 (S.D.N.Y.), aff'd, 163 F.3d 151 (2d Cir. 1998) (this is "consistent with the principle that a defendant cannot tortiously interfere with a contract if he is not a third party unrelated to the contract") (internal quotation marks and citation omitted).

16

According to the Complaint, in 2013, the LIPA Reform Act gave PSEG LI "additional operational and policy making authority," (Compl. ¶ 7), and its "expanded role included long-term power supply strategy and planning" and "gave it significant operational flexibility to manage capital expenditures, budgets, and emergency response preparedness," (Compl. ¶¶ 8, 31). Even giving the Complaint a liberal reading, the Court cannot conclude that LIPA was a third party unrelated to the contract. The Complaint alleges the opposite: that PSEG LI was LIPA's agent, and cannot be held liable for inducing LIPA to breach a potential business relationship with Plaintiffs. However, if Defendants committed acts of fraud or misrepresentation (which makes the antitrust meeting of the minds unlikely), then it may be possible they acted outside their scope of authority. Count III is accordingly DISMISSED without prejudice.

IV. Leave to Replead

Plaintiffs request that any dismissal be without prejudice to their filing an amended complaint to address deficiencies identified by the Court. (Pl. Br. at 30.) "The plaintiff[s have] not suggested how [they] will be able to cure the numerous deficiencies in [the C]omplaint. Nevertheless, because leave to amend should be freely given when justice so requires," the Court will allow Plaintiffs to file an Amended Complaint as to all claims. Cenedella, 348 F. Supp. 3d at 363

17

(citing FED. R. CIV. P. 15(a)(2)). Any Amended Complaint must be filed within thirty (30) days from the date of this Order. Should Plaintiffs file an Amended Complaint that cures the deficiencies identified in this Order, the Court will consider Defendants' remaining arguments and any additional arguments upon Defendants' renewed motion.

## CONCLUSION

Accordingly, Defendants' motion to dismiss (D.E. 17) is GRANTED. The Complaint is DISMISSED without prejudice and with leave to replead within thirty (30) days of the date of this Order.

SO ORDERED.

/s/ JOANNA SEBYERT
Joanna Seybert, U.S.D.J.

Dated: September 30, 2019
       Central Islip, New York